IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 08 CR 452 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| BOBBIE BROWN, JR., et al., | ) | |
| (TREYONDA TOWNS) | ) | |

## MEMORANDUM OPINION AND ORDER

On February 5, 2010, a jury convicted Defendant Treyonda Towns ("Towns") of wire fraud

in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341. Towns now moves

for a judgment of acquittal and alternatively for a new trial. For the reasons explained below, the

Court denies Towns's Motion for Judgment of Acquittal and her Motion for a New Trial.

## BACKGROUND

### I. Indictment and Pretrial Conference

In June 2008, a federal grand jury returned two indictments related to mortgage fraud

schemes in Chicago and Las Vegas ("the Chicago scheme" and "the Las Vegas scheme"). The

Chicago indictment charged 21 defendants in a scheme involving 150 properties and the Las Vegas

indictment charged 13 defendants in a scheme involving 32 properties. The only individual named

as a Defendant in both indictments was Towns's Co-Defendant Bobbie Brown Jr. ("Brown").

The Las Vegas scheme indictment named Towns in two Counts–in Count I for wire fraud

in violation of 18 U.S.C. § 1343, and in Count IV for mail fraud in violation of 18 U.S.C. § 1341.

The indictment charged that Towns worked for B&M Custom Homes, Inc., a business owned used

in the Las Vegas scheme to facilitate the purchase and sale of real estate. Towns, according to the

indictment, facilitated the scheme by recruiting Co-Defendant Carolyn Thompson ("Thompson")

1

to knowingly provide false account letters for unqualified buyers in order to induce lenders to issue loans to those buyers. The indictment further charged that Towns received proceeds of mortgage loans issued by lenders and used those proceeds in furtherance of the scheme.

At the final pretrial conference on January 19, 2010, the Court granted the Government's Motion in Limine to Admit Evidence of Other Criminal Conduct, holding that evidence explaining how various witnesses came to know Towns, how their relationship of trust emerged, and how they came to be involved in the Las Vegas scheme, was admissible under the "intricately related" doctrine. (*See* R. 206.) The Court also ruled that certain evidence pertaining to the type and timing of conduct charged in the Chicago scheme would be admissible under Federal Rule of Evidence 404(b) ("Rule 404(b)"). Finally, the Court granted the Government's Santiago Proffer over Towns's objection. (*See* R. 206.)

## II. Trial Testimony

During trial, testimony revealed that Towns claimed to work for B&M Custom Homes, a sham business used to facilitate the Las Vegas scheme. Testimony further demonstrated that Towns was a loan officer licensed in the state of Illinois who had knowledge about the loan process and mortgage industry. She executed false Verification of Employment letters ("VOEs") as part of the Las Vegas scheme and recruited into the scheme Thompson, who provided false accountant letters in connection with the properties at issue in the two-Count indictment against Towns. Towns's counsel vigorously cross-examined each of Towns's cooperating Co-Defendants as to the potential benefits they could receive from testifying in Towns's trial and regarding the substance of their trial testimony as compared to their statements to the Government in prior interviews. (*See, e.g.*, Tr. Trans. Feb. 3, 2010, 9:38:46-10:10:20; 2:05:02-2:12:44; 4:11:05-4:28:01; Tr. Trans. Feb. 4, 2010,

11:55:23-12:10:25; 2:57:51-2:59:05; 3:03:02-3:12:23.)  In her Motions for a New Trial and Judgment of Acquittal, Towns specifically focuses on the trial testimony of Co-Defendants Thompson, Brian Barss ("Barss"), Jennifer Lorenzen ("Lorenzen"), Wayne Harris ("Harris"), and Barry Adams ("Adams").  The Court summarizes their testimony below.

### A. Testimony of Carolyn Thompson

Thompson testified that she is an accountant with Thompson Tax and Accounting Services. (*See* Tr. Trans. Feb. 2, 2010, 1:26:01-1:26:23.)  She explained that she first met Towns when they attended Heartland Community College together.  (*See* Tr. Trans. Feb. 2, 2010, 1:28:10-1:28:58.) According to Thompson, Towns studied to obtain her loan officer license while working for B&M Custom Homes out of her home, and obtained that licence around June or July of 2006.  (*See* Tr. Trans. Feb. 2, 2010, 1:29:39-1:35:17; 1:37:46-1:38:05.)  When Thompson later took courses to try to become a loan officer herself, Towns "helped [her] to understand the flow of what goes in the documents and how to get them" while also showing her some of her own loan processing paperwork.  (*See* Tr. Trans. Feb. 2, 2010, 1:41:56-1:43:44.)  Thompson testified that B&M Custom Homes owned the home where Towns lived with Brown, and that Towns explained to her that "she did not know how much the mortgage was, because it was being paid for through the business." (*See* Tr. Trans. Feb. 2, 2010, 1:50:01-1:50:28.)

With respect to Thompson's direct role in the Las Vegas scheme, she testified that in September 2006, Towns contacted her by phone and asked her to provide a Certified Public Accountant ("CPA") letter for Co-Defendant Kenneth Smith ("Smith") after verifying on the phone that she knew Thompson was not a CPA.  (*See* Tr. Trans. Feb. 2, 2010, 1:52:51-1:53:21.)  When Thompson asked to see Smith's actual tax returns in order to verify that she had reviewed them,

Towns told her that Harris would contact her. (*See* Tr. Trans. Feb. 2, 2010, 1:53:59-1:55:14.) Thompson testified that Harris then called her and said that they did not have time to allow her to review Smith's tax returns. (*See* Tr. Trans. Feb. 2, 2010, 1:55:14-1:58:14.) After a follow up call from Brown, Thompson agreed to prepare a letter stating that she had reviewed Smith's tax returns for a number of years and "was verifying his company." (*See* Tr. Trans. Feb. 2, 2010, 1:58:14-1:59:27.) Thompson then went on to testify that Towns contacted her within a few days to say that the letter was insufficient–it needed to state that Thompson actually prepared Smith's taxes and to have more official letterhead. (*See* Tr. Trans. Feb. 2, 2010, 2:00:05-2:01:59.) In response to Thompson's expressions of discomfort, Towns "got a little bit high toned and stated, 'do you want the money or not.'" (*See* Tr. Trans. Feb. 2, 2010, 2:02:30-2:02:43.) After Thompson provided Towns with the first CPA letter, Thompson testified that she met with Towns and Brown at Leona's Restaurant in Hyde Park to discuss providing false CPA letters on an ongoing basis; Towns explained at this meeting that she and Brown were business partners and so anything that needed to be discussed could be discussed in front of her. (*See* Tr. Trans. Feb. 2, 2010, 2:21:06-2:29: 47.) Finally, Thompson testified that she provided false CPA letters for the two properties listed in Counts 1 and 4 of the Indictment (the Counts against Towns). (*See* Tr. Trans. Feb. 2, 2010, 2:38:00-2:41:26; 2:42:48-2:44:43.)

**B. Testimony of Brian Barss**

Barss, a loan officer for Best Equity Solutions, began his testimony explaining that a VOE is a document "provided by the employer substantiating the claims of the prospective buyer, in terms of their employment, their position, and their employment history with the company." (*See* Tr. Trans. Feb. 3, 2010, 10:39:56-10:40:14; 10:48:40-10:48:56.) He testified that he completed

approximately 21 real estate transactions in connection with the Las Vegas scheme, sometimes using CPA letters prepared by Thompson. (*See* Tr. Trans. Feb. 3, 2010, 11:34:58-11:35:35, 11:42:27-11:43:30.) He identified a note on a VOE for Co-Defendant Steven Anderson's ("Anderson") loan application stating "Per Trey Smith, Mr. Anderson is a project manager with B&M Custom Homes and has been for seven years," as well as a note indicating that "Trey Towns" verified Anderson's employment at B&M Custom Homes. (*See* Tr. Trans. Feb. 3, 2010, 11:58:07-12:03:14; 12:08:04-12:09:12.) Barss went on to testify that Brown told him to contact Towns for any specific needs, and that he proceeded to call Towns approximately 50 to 100 times over the course of several months (speaking with her five to ten times) to provide written and verbal VOEs for Anderson, Smith, and others; he also testified that Towns in fact provided those VOEs. (*See* Tr. Trans. Feb. 3, 2010, 12:19:02-12:46:03; 1:53:11-1:53:32.)

### C. Testimony of Jennifer Lorenzen

Lorenzen, a Las Vegas realtor, testified that she was first recruited into the scheme when she met Brown and he explained that his business was expanding to Las Vegas and he would like her help in finding properties where, based on the appraisal value, a loan would issue for more than the list price of the property and the additional money would be sent to B&M Custom Homes. (*See* Tr. Trans. Feb. 3, 2010, 2:51:52-2:54:43.) She testified that Brown instructed her to contact Towns to obtain invoices for work on properties to support payments to B&M Custom Homes, and Towns provided those invoices on approximately four occasions. (*See* Tr. Trans. Feb. 3, 2010, 2:58:31-3:03:26.) Lorenzen further explained that on approximately four occasions, Towns agreed to prepare VOEs to send to loan officers after she told Towns what the borrower's income level and job history should be to obtain a loan; Towns then provided VOEs to Lorenzen. (*See* Tr. Trans. Feb.

3, 2010, 3:22:03-3:24:33; 3:28:34-3:30:27.) Finally, Lorenzen identified a business card indicating two numbers for an individual by the name of "Tre" and confirmed that she called those numbers to reach Towns at home and at work. (*See* Tr. Trans. Feb. 3, 2010, 3:26:23-3:28:21.)

### D. Testimony of Wayne Harris

During the Government's direct examination of Harris, he testified that he met Brown while working as a loan originator at Unique Mortgage Consultants, and Brown eventually began sending him buyers and paying him side bonuses for each of the loans that he closed based on false information. (*See* Tr. Trans. Feb. 4, 2010, 10:21:58-10:26:29.) Harris then testified that he had approximately seven to ten phone conversations with Towns during which he gave her information necessary to do VOEs for Anderson and other individuals. (*See* Tr. Trans. Feb. 4, 2010, 10:43:37-10:45:32.) Harris explained that "Trey Smith" was an alias adopted by Towns after hearing Brown use "Smith" as his alias last name. (*See* Tr. Trans. Feb. 4, 2010, 10:55:25-10:56:01.) He testified that it was Towns who gave him Thompson's contact information to obtain CPA letters for loan approval on approximately two occasions. (Tr. Trans. Feb. 4, 2010, 10:45:38-10:47:10.)

### E. Testimony of Barry Adams

Adams testified that he is a truck driver who previously worked for Brown Trucking, a company owned by Brown. (Tr. Trans. Feb. 4, 2010, 2:18:17-2:19:09.) He testified that Towns started working at B&M Custom Homes after Christmas of 2005 as a loan officer and lived in a home with Brown that was paid for by B&M Custom Homes. (Tr. Trans. Feb. 4, 2010, 2:34:01-2:34:47; 2:38:00-2:38: 45.) Adams testified that he personally heard Brown ask an individual he called "Trey" to execute a false VOE on the phone and then saw Towns execute a VOE. (Tr. Trans. Feb. 4, 2010, 2:41:45-2:43:59.)

### III. Key Exhibits

Among the exhibits introduced by the Government that tended to corroborate the testimony of Towns's Co-Defendants was a business card showing the name "Tre" in connection with the phone number for B&M Custom Homes, "XXX-XXX-9561." The Government also presented a form indicating that "Trey Towns" at her home number of "XXX-XXX-8333" verified Anderson's employment. Other exhibits introduced by the Government at trial similarly revealed the name "Trey Smith" or "T. Smith" as orally verifying Anderson's employment with B&M Custom Homes for seven years.

Finally, the Government presented exhibits showing that lender Countrywide Home Loans transferred $758,812 from its Bank of New York account to Land America's Lawyer's Title account at Bank of Nevada as mortgage loan proceeds issued to Smith for the purchase of 4347 Spooner Lake Circle, Las Vegas, Nevada–the property charged in Count I against Towns. A print screen from Countrywide's files showed that these funds were transferred across state lines. The Government also introduced a December 29, 2006 United Parcel Service ("UPS") receipt for shipment of documents related to the purchase of a property at 5373 San Milano Ave., Las Vegas, Nevada–the property charged in Count IV against Towns. The purchaser's husband, Donald Felton, testified that on January 2, 2007, his wife signed those documents in his and Allen Robinson's presence, demonstrating that the documents were in fact received by the addressee Allen Robinson.

### IV. Verdict

After deliberating, the jury found Towns guilty of: (1) knowingly causing funds in the amount of approximately $758,812 to be transmitted by means of wire communication in interstate commerce in violation of 18 U.S.C. § 1343; and (2) knowingly causing loan documents related to the purchase of a Las Vegas residence to be sent and delivered by UPS for the purpose of executing a fraudulent scheme with intent to carry out a fraudulent scheme in violation of 18 U.S.C. § 1341. Towns now seeks a judgment of acquittal under Federal Rule of Civil Procedure 29 ("Rule 29"), claiming that the evidence presented at trial did not support her conviction and that the Court improperly admitted evidence related to the Chicago scheme under the intricately related doctrine, Federal Rule of Evidence 404(b) ("Rule 404(b)"), and the Government's Santiago Proffer. Towns also moves for a new trial under Federal Rule of Civil Procedure 33 ("Rule 33"), arguing that there was insufficient evidence to support the jury's guilty verdict.

## DISCUSSION

### I. Motion for Judgment of Acquittal

A motion for judgment of acquittal under Rule 29 challenges the sufficiency of the evidence against a defendant. *See* Fed. R. Crim. P. 29. Such a motion should be denied if, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004). A conviction entered after trial by jury should not be overturned unless "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (citing *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999)).

### A. Sufficiency of the Evidence

Towns was named in two Counts of a seven-Count indictment. Count I charged Towns with knowingly causing funds in the amount of approximately $758,812 to be transmitted by means of wire communication in interstate commerce in violation of 18 U.S.C. § 1343. This transfer allegedly represented the proceeds of a mortgage loan to her Co-Defendant Smith for the purchase of a residence located at 4347 Spooner Lake Circle, Las Vegas, Nevada. Count IV charged Towns with knowingly causing loan documents related to the purchase of a residence located at 5373 San Milano Avenue, Las Vegas, Nevada to be sent and delivered by UPS for the purpose of and with intent to carry out a fraudulent scheme in violation of 18 U.S.C. § 1341.

To obtain a conviction for wire or mail fraud under 18 U.S.C. § 1343, the Government must prove beyond a reasonable doubt: "the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mail (for 18 U.S.C. § 1341) or wires (for 18 U.S.C. § 1343) in furtherance of the fraudulent scheme." *United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007). Towns argues that the Court should grant a judgment of acquittal because the Government failed to produce sufficient admissible evidence to prove that Towns participated in a scheme to defraud and had the requisite level of intent–the first two elements of wire and mail fraud. (*See* R. 227, p. 4.)

First, with respect to Towns's participation in a scheme to defraud, the testimony at trial revealed that Towns claimed to work for one of Brown's businesses–B&M Custom Homes–which was a sham business used to facilitate the fraudulent scheme. Testimony further revealed that Towns was a loan officer licensed in the state of Illinois who had knowledge about the loan process and mortgage industry. Lorenzen and Barrs each testified that they asked Towns for false VOEs in furtherance of the scheme and Towns provided these VOEs. This evidence was corroborated by

documentation in the form of a business card identified by Lorenzen showing the name "Tre" in connection with the phone number for B&M Custom Homes, "XXX-XXX-9561," as well as an exhibit indicating that "Trey Towns" at her home number of "XXX-XXX-8333" orally verified Anderson's employment. Other documents introduced by the Government at trial similarly revealed that "Trey Smith" or "T. Smith" verified Anderson's employment with B&M Custom Homes, which, in conjunction with Harris's testimony that "Trey Smith" was an alias adopted by Towns, indicated that Towns was the individual who performed those VOEs.

In addition to providing these false VOEs, Thompson's testimony revealed that Towns recruited Thompson to provide false CPA letters to submit to lenders. Specifically, Thompson testified that Towns first approached her to provide a false CPA letter and subsequently instructed her on ways to make the letter look and sound more official. After Thompson provided Towns with the first such letter, Thompson testified that she met with Towns and Brown at Leona's restaurant and discussed providing these letters on an on-going basis. Thompson then admitted that after Towns recruited her, she provided the letters for the two properties found in Counts I and IV, for which Towns was convicted. When viewed in the light most favorable to the Government, this evidence was sufficient to demonstrate the first element of Towns's participation in the scheme beyond a reasonable doubt. *See Hicks*, 368 F.3d at 804.

Turning to the second element of intent to defraud, the Government was required to show Towns's "willful participation in the scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved." *United States v. Bailey*, 859 F.2d 1265, 1273 (7th Cir. 1988) (internal citation and quotation marks omitted). More specifically "intent to defraud" requires an act by the defendant "with the specific intent to deceive or cheat, usually for the purpose of

getting financial gain for one's self or causing financial loss to another." *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004).   The evidence presented at trial tending to show Towns's specific intent to both participate in the fraudulent scheme and to deceive included the testimony of Lorenzen and Barss that they asked for false VOEs for many individuals and Towns provided those VOEs even though, as a B&M Custom Homes employee, she knew them not to work for B&M Custom Homes.   Thompson's testimony that Towns was a licensed loan officer and discussed the documents involved with Thompson further indicates that she had an understanding of the role VOEs and CPA letters play in the loan process, and thus acted with the intent to defraud lenders who would then receive those materials.

Moreover, Thompson's testimony that Towns approached her and asked for a false CPA letter after acknowledging that she was not a CPA, then instructed her on how to make her letters appear more legitimate, then met with Thompson in the company of Brown and discussed Thompson's willingness to provide additional false tax letters, demonstrates that she not only willfully acted in furtherance of the scheme but knew about the deceitful elements of the scheme. *See id.*   Indeed, Thompson testified that Towns explained in their meeting at Leona restaurant that she and Brown were business partners and so anything that needed to be discussed could be discussed in front of her, including Thompson providing further false CPA letters, leading to an inference that she was well aware of the scheme's fraudulent nature.   Finally, the testimony of Adams and Thompson showed that Towns benefitted from the scheme financially through living in

a house with Brown paid for by B&M Custom Homes, leading to an inference that she acted for the purpose of "getting financial gain for [her]self." *See id.*[1]

For these reasons, a reasonable jury could have found that the evidence presented at trial was sufficient to show, beyond a reasonable doubt, that Towns: (1) knowingly caused Countrywide to transfer $758,812 across state lines as mortgage loan proceeds for the purchase of 4347 Spooner Lake Circle, Las Vegas, Nevada for the purpose of and with intent to further a fraudulent scheme; and (2) knowingly caused loan documents relating to the purchase of property at 5373 San Milano Ave., Las Vegas, Nevada to be sent and delivered by UPS for the purpose of executing a fraudulent scheme and with the intent to further a fraudulent scheme. *See Hicks*, 368 F.3d at 804.

### B. Government's Use of Evidence Regarding the Chicago Scheme

In her Motion for a Judgment of Acquittal, Towns also objects to the Court's admission of evidence related to the Chicago scheme pursuant to the intricately related doctrine, F.R.E. 404(b), and the Government's Santiago Proffer. Towns specifically disputes the admissibility of the Government's Exhibits 8G, 54F, and 20B. The Court notes that Towns's arguments related to purported errors at trial are more properly considered under the Rule 33 standard. *See, e.g.*, *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (explaining that a new trial pursuant to Rule

---

[1]Towns does not challenge the sufficiency of the evidence with respect to the third element required to sustain a conviction for wire or mail fraud–namely, the "use of the mail (for 18 U.S.C. § 1341) or wires (for 18 U.S.C. § 1343) in furtherance of the fraudulent scheme." *See Radziszewski*, 474 F.3d at 484-85. However, the Government presented sufficient evidence of the use of wires in furtherance of the scheme through testimony and documentation showing that, in partial reliance on the CPA letter provided by Thompson (who Towns recruited into the scheme), lender Countrywide transferred $758,812 across state lines as mortgage loan proceeds issued to Smith for the purchase of 4347 Spooner Lake Circle, Las Vegas, Nevada. Indeed, a print screen from Countrywide's files showed that the funds were transferred across state lines and Thompson testified that she provided a false CPA letter in connection with that property. The Government also introduced sufficient evidence of use of mail in furtherance of the scheme through testimony and documentation showing that, partially in reliance on a false CPA letter provided by Thompson, documents were shipped across state lines related to the purchase of a property at 5373 San Milano Ave., Las Vegas, Nevada. This evidence included a December 29, 2006 UPS receipt for shipment of the documents and the testimony of Thompson and Felton.

33 is warranted where "evidence was erroneously permitted to go to the jury, substantially affecting the rights of the accused"). To the extent that Towns argues that the evidence against her would have been insufficient without the Government's use of evidence related to the Chicago scheme, however, the Court considers these alleged errors in addressing her Motion for Judgment of Acquittal.

### 1. Intricately Related Doctrine

At the pretrial conference on January 19, 2010, the Court granted, over Towns's objection, the Government's Motion in Limine to Admit Evidence of Other Criminal Conduct under the intricately related doctrine. (*See* R. 206.) "Evidence that is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of the charged crime" is admissible under the "intricately related" doctrine. *See United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002). At trial, the Court correctly admitted evidence related to the Chicago scheme under this doctrine only to the extent that it explained how various witnesses came to know Towns, how their relationship of trust emerged, and how they came to be involved in the Las Vegas scheme. *See United States v. Wantuch*, 525 F.3d 505, 518 (7th Cir. 2008) (finding evidence of uncharged criminal activity properly admitted when it established the relationship between co-conspirators, "outlined how the relationship of trust and cooperation . . . was born," and showed that the defendant willingly participated in illegal activity); *see also United States v. Johnson*, 248 F.3d 655, 665 (7th Cir. 2001) (evidence was admissible under the intricately related doctrine that "served to demonstrate that these men knew each other well before the charged crime").

Towns attempts, in her reply brief, to distinguish the facts of this case from those in *Johnson*, 248 F.3d at 665. (*See* R. 233, p. 4.) She argues that "the evidence admitted under the intricately related doctrine in *Johnson* directly connected two co-defendants to the crime charged," whereas here, the evidence related to the Chicago scheme does not directly link any of the Co-Defendants to the Las Vegas scheme. (*See* R. 233, p. 4.) Given, however, that the Chicago and Las Vegas schemes overlapped temporally and many of the relationships between the Co-Defendants originated in Chicago or grew out of the Chicago scheme (including Towns's relationship with Smith and recruitment of Thompson), the limited evidence admitted was permissible, as it was in *Johnson*, to show how the relationship between the various actors in the Las Vegas scheme developed. *See id.* at 664-65 (explaining that evidence of prior trips "served to demonstrate that these men knew each other well before the charged crime" and was admissible under the intricately related doctrine). (*See also* Pretrial Conf. Tr. January 19, 2010, 4:28:44-4:29:27.) The evidence also demonstrated how the Co-Defendants and Towns came to be involved in the same types of behaviors involved in the Las Vegas scheme–thus linking them to the charged crimes. *See id.*

In addition, the evidence pertaining to the Chicago scheme introduced at trial had the probative value of giving the jury a complete picture of the relationships between Towns and the witnesses and, given that its use was limited, was not unfairly prejudicial under Federal Rule of Evidence 403. *See id.* (explaining that the balancing test under Rule 403 must also be satisfied for testimony to be admissible under the intricately related doctrine). Looking to the specific exhibits that Towns objects to in her Motion, for example, the Government's use of Exhibit 54F was proper under the intricately related doctrine and not unduly prejudicial. Exhibit 54F contained a summary of the approximate date, address, buyer, and loan amounts for 22 properties, including several not

charged in the Las Vegas scheme. Although not itself admitted into evidence, the Court allowed the use of the summary chart to refresh the recollection of Barss and Smith regarding their involvement with certain properties. *See* Fed. R. Evid. 803(5) ("The following are not hearsay, even though the declarant is available as a witness: . . . A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory"). The Court properly allowed the use of Exhibit 54F for this limited purpose. It then permitted the testimony of Barss and Smith related to a few properties listed in Exhibit 54F but not charged against Towns because it had the probative value of showing how they became involved in the Las Vegas scheme under the intricately related doctrine, and was not overly prejudicial in that the Government did not question the witnesses at length about each of the various properties or focus on properties involved in the Chicago scheme. *See Wantuch*, 525 F.3d at 518.

Similarly, the next exhibit that Towns objects to, Government Exhibit 20B, was a loan file for a property in Palos Heights, Illinois. Exhibit 20B was properly introduced under the intricately related doctrine, as even Towns in her Response admits that Harris testified that he met Towns at that property and Anderson testified that the file for this property showed that a "T. Smith" from B&M Custom Homes verified his employment in connection with obtaining a loan to purchase this property. (*See* R. 227, p. 7.) This Exhibit thus had highly probative value in that it was used to elicit testimony about how Harris came to know Towns and how Anderson developed a relationship of trust with Towns. *See Wantuch*, 525 F.3d at 518; *Johnson*, 248 F.3d at 665. It was not unfairly prejudicial because the Government did not dwell on this testimony and Towns's alleged conduct

in connection with the Palos Heights property was nearly identical to the conduct charged in the Las Vegas scheme.[2]

## 2. Federal Rule of Evidence 404(b)

Towns next objects to the Court's ruling in the final pretrial conference that certain evidence pertaining to the type and timing of conduct charged in the Chicago scheme was admissible under Rule 404(b). (*See* Pretrial Conf. Tr. January 19, 2010, 4:42:49-4:44:35.) Rule 404(b) provides that while evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith," it may be admissible to demonstrate "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Evidence is admissible under Rule 404(b) if it "(1) is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) is sufficient to support a jury finding that the defendant committed the similar act, and (4) has probative value which is not substantially outweighed by the danger of unfair prejudice." *United States v. Whitlow*, 381 F.3d 679, 686 (7th Cir. 2004).

Here, the Court properly admitted limited evidence of the Chicago scheme to show intent, preparation, knowledge, or absence of mistake on the part of Towns because of the temporal relation and similarity of the fraudulent conduct involved in both schemes. *See* Fed. R. Evid. 404(b). Although Towns is correct that the Government chose to file two separate indictments for the schemes, certain acts involved in the Chicago scheme were probative as to Towns's intention to enter into the Las Vegas scheme and the prior knowledge because the Las Vegas scheme was an

---

[2]The Court addresses the propriety of the final exhibit objected to in Towns's Motion for Judgment of Acquittal, Exhibit 8G, below in the Rule 404(b) discussion.

expansion of the Chicago scheme. Moreover, any prejudice caused by the admission of this evidence was mitigated by the Court's instruction to the jury that: "You have heard evidence of acts of the defendant other than those charged in the indictment. You may consider this evidence only on the question of motive, intent, plan, identity, and knowledge. You should consider this evidence only for this limited purpose." (*See* R. 221, p. 12.) Towns has presented no evidence to show that the jury did not abide by this instruction, and "absent a showing to the contrary, [there is a presumption] that the jury limited its consideration of testimony in accordance with the trial court's instruction." *See United States v. Bermea-Boone*, 563 F.3d 621, 625 (7th Cir. 2009). Thus, the jury is presumed to have followed this instruction and limited their consideration of the Chicago scheme evidence according to the terms of the Federal Rules of Evidence. *See* Fed. R. Evid. 404(b).

Looking more specifically to the exhibits Towns objects to in her Motion, in addition to Exhibits 54F and 20B discussed above, Towns takes issue with Government Exhibit 8G, a VOE contained in the loan file for 12236 Lancashire Court in Mokena, IL. Agent Mark Pulido from the United States Postal Inspection Services testified that a "Trey Towns" was listed as the contact for this VOE. Exhibit 8G was thus properly admitted under Rule 404(b) as evidence of a bad act by Towns that was not admitted to show propensity, but to show knowledge, intent, and absence of mistake through fraudulent conduct identical to that which Towns performed in the Las Vegas scheme. As corroborated by Agent Pulido's testimony, this exhibit was sufficient to support a jury finding that Towns committed this similar act, and the danger of unfair prejudice was minimal in that evidence of this act would be unlikely to mislead or confuse the jury--the Government did not use it to elicit testimony regarding the size or scope of the Chicago scheme, and the jury could

understand it precisely in the context of testimony about Towns's actions in the Las Vegas scheme.

*See Whitlow*, 381 F.3d at 686.

### 3. Santiago Proffer

The Court also granted the Government's Santiago Proffer over Towns's objection at the final pretrial conference. (*See* R. 206.) In her Motion for Judgment of Acquittal, Towns does not object to the admissibility of the statements of Towns's Co-Defendants regarding the Las Vegas scheme; indeed, these were admissible as statements "offered against a party" and made "by a coconspirator of a party during the course of and in furtherance of the conspiracy." F.R.E. 801(d)(2)(E). Nor does Towns argue that the Government failed to show by a preponderance of the evidence that a conspiracy existed and that, with respect to each Co-Defendant, Towns and that Co-Defendant were members of that conspiracy. *See United States v. Yoon*, 128 F.3d 515, 526 (7th Cir. 1997) (explaining that under *United States v. Santiago*, 582 F.3d 1128 (7th Cir. 1978), "in order to allow the admission of coconspirator statements, the government must show, by a preponderance of the evidence, that a conspiracy existed, that the defendant and declarant were members of that conspiracy, and that the statements sought to be admitted were made during and in furtherance of that conspiracy"). Instead, Towns argues that the Court should not have granted the Santiago Proffer with respect to coconspirator statements related to the Chicago scheme because they were not made in furtherance of the Las Vegas scheme in which Towns was charged.

At the final pretrial conference, the Court held that the Seventh Circuit's dicta in *United States v. DiDomenico* relied upon by Towns addressed a situation both factually and legally distinct from this case. *See* 78 F.3d 294, 303-04 (7th Cir. 1996) (explaining that "a conspiracy, and a conspiracy to conceal an earlier, completed conspiracy, are . . . like two different firms, and statements made in furtherance of [a] second, [] cover-up conspiracy" are "not admissible to demonstrate participation in or the acts of the first conspiracy"). Unlike in *DiDomenico*, the

statements that the Government sought to introduce here were not made in furtherance of a completely separate, cover-up conspiracy. *See id.* Instead, the statements admitted could be reasonably interpreted as in furtherance of the Las Vegas scheme, which arose out of the Chicago scheme and was thus inherently intertwined with it. *See United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987) (to be admissible, statements "need not have been exclusively, or even primarily, made to further the conspiracy," and may even be "susceptible of alternative interpretations") (internal citation omitted). Notably, Towns does not point to any specific objectionable coconspirator statements admitted at trial in her motion, but rather generally argues that the Court's ruling at the pretrial conference was incorrect. (*See* R. 227, pp. 10-11.) As the Court explained in sections I(B)(2) and (3) *infra*, however, the Co-Defendants's testimony related to the Chicago scheme was admitted only to show how individuals became involved with Towns and the Las Vegas scheme under the intricately related doctrine and to show Towns's knowledge, intent, and absence of mistake in the Las Vegas scheme under Rule 404(b). Thus, even though the Co-Defendants's statements in this regard may not have been "exclusively, or even primarily, made to further" the Las Vegas scheme, they can be interpreted to be in furtherance of it. *See Shoffner*, 826 F.2d at 628. Thus, the Court did not err in granting the Government's Santiago Proffer.

Moreover, even if the Court had erred in admitting or permitting the use of the three Government exhibits to which Towns objects in her Motion for Judgment of Acquittal, none of those exhibits are relied on in section I(A) above to show that the evidence was sufficient to support a conviction. As such, even in the absence of these exhibits, the record is not "devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *See Curtis*, 324 F.3d at 505. The Court, therefore, denies Towns's Motion for Judgment of Acquittal.

## II.    Motion for New Trial

A motion for a new trial under Rule 33(a) should be granted only if required "by the interest of justice."  Fed. R. Crim. P. 33(a).  Such motions should be granted sparingly and are only appropriate if "substantial rights of the defendant have been jeopardized by errors or omissions during trial."  *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).  A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict.  *See United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996).  In "weighing a motion for a new trial . . . a court may properly consider the credibility of the witnesses."  *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  The focus is not "whether the testimony is so incredible that it should have been excluded"; "[r]ather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."  *Id.*

In her Motion for a New Trial, Towns claims that the guilty verdict was against the weight of the evidence because the Government did not put forth sufficient credible evidence showing "intent to defraud . . . with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another."  *See Corley*, 388 F.3d 1005.  More specifically, Towns argues that the Government's evidence tending to show her intent to defraud was insufficient because her cooperating Co-Defendants provided an "embellished account of [her] participating in the Las Vegas scheme."  (*See* R. 225, p. 15.)  "In re-weighing the credibility of these witnesses," Towns claims, "the Court is well within its discretion to find that, absent such inconsistent and outright unreasonable testimony, the government has virtually no evidence that defendant Towns recruited anyone for the Las Vegas scheme."  (*See* R. 225, p. 15.)  Because,

however, the testimony of Towns's Co-Defendants with whom she takes issue–Thompson, Lorenzen, Barss, Adams, and Harris–was subject to vigorous cross-examination, was generally rehabilitated on direct and corroborated, and was the subject of a caution and great care jury instruction, the Court does not find that the verdict was "against the manifest weight of the evidence." *See Washington*, 184 F.3d at 657.

At trial, Towns's attorney actively and effectively cross-examined the Co-Defendant witnesses regarding the differences between their initial statements to the Government and their accounts of Towns's involvement at trial and in preparation for trial. Although Towns, in her Motion, claims that most of the testimony about her participation in the Las Vegas scheme was fabricated or greatly exaggerated after her Co-Defendants had pled guilty and were hoping for leniency, that is not an accurate picture of their testimony. Thompson, for example, explained on redirect-examination that in one of her initial conversations with the Government on March 14, 2008, she stated that the first false CPA letter she executed was the result of a call from Towns, that she and Towns had discussed her executing CPA letters for B&M Custom Homes, and that Towns told her to have letterhead created for false CPA letters. (*See* Tr. Trans. February 3, 2010, 10:20:10-10:22:00.) Although Thompson acknowledged adding more detailed incriminating information about Towns during her January 2010 trial preparation interviews, Thompson's outline of Towns's involvement remained consistent from March 14, 2008 forward. Similarly, even though Barrs altered his testimony as to the number of calls he received from Towns and whether he received false invoices from Towns only, in his grand jury statement on June 3, 2008--mere days after his initial interview with the Government--Barss testified that he received false VOEs and false invoices from Towns. (*See* R. 225, p. 6.)

Towns further admits in her Response that Lorenzen mentioned as early as her July 2007 interview with the Government that "Towns or Tish" provided her with invoices used to validate HUD payments." (*See* R. 225, p. 7.) As Towns also acknowledges, although Harris testified as to more personal knowledge of Towns's actions before trial than he had previously, in his first interview with the Government on April 21, 2008 he described an instance when Brown told him that Towns executed a false VOE, and in a subsequent interview on May 16, 2008 he testified that Towns occasionally used the alias "Smith." (R. 225, pp. 3-4.) Indeed, Harris testified that in his grand jury statement on May 16, 2008 he wrote that he knew Towns and Brown "to do false verifications of employment" and "discussed these false VOEs with both Bobbie and Trey." (*See* Tr. Trans. February 4, 2010, 12:13:36-12:14:51.) Harris also explained on redirect that in his initial April 21, 2008 meeting with the Government, the conversation did not focus on any particular individual, implying that he did not go into detail about Towns's involvement because she was not the focus of the interview. (*See* Tr. Trans. February 4, 2010, 12:10:44-12:10:59.) Thus, this is not a situation where Towns's Co-Defendants said nothing about her involvement in the scheme for years and then, on the eve of trial, began to testify that she was in fact a participant. Unlike in *Washington*, where "nothing link[ed the Defendant] to the conspiracy" other than the testimony of one witness whose testimony had been deemed "incredible" by the court, here the Co-Defendant witnesses's testimony, even in their earliest interviews with the Government, directly links Towns with the fraudulent scheme. *See* 184 F.3d at 657-58.[3]

---

[3]Towns further contends that there was a lack of evidence showing that Towns received anything of value for her alleged participation in the scheme. *See Corley*, 388 F.3d at 1005. Towns ignores, however, Adams's testimony that Towns lived in a home with Brown that was paid for by B & M Custom Homes, which was corroborated by Thompson's testimony that Towns did not have to pay for her mortgage because it was being paid for by B&M Custom Homes.

The Court further notes that because Towns's Co-Defendant and the mastermind of both the Las Vegas and Chicago schemes, Brown, did not plead guilty until the day after the Court held a pretrial conference for both Towns and Brown on January 19, 2010, it is understandable that the Government largely focused its questioning on Brown's actions up until that point. Indeed, certain of the Co-Defendants's testimony implies that this focus was the reason that he or she did not provide greater detail about Towns's participation until before trial. Although Lorenzen only occasionally mentioned Towns in her initial interviews with the Government, for instance, on redirect she explained that in those meetings she was asked about Brown's involvement and what she knew about Brown. (*See* Tr. Trans. February 3, 2010, 4:30:02-4:30:36.) Adams similarly explained on cross-examination that during his first meetings with the Government, the agents told him that they were interviewing him regarding his "dealings and employment with Bobbie Brown" and that "whatever they asked [him], [he] told them." (*See* Tr. Trans. February 4, 2010, 3:03:24-3:04:13.) Given that a total of 13 Defendants were originally indicted in the Chicago scheme, the Government understandably did not concentrate its questioning on Towns or ask detailed questions about her involvement until the majority of her Co-Defendants had pled guilty and it became more clear that she would not.

The credibility of the testimony of the cooperating Co-Defendants is also demonstrated through the internal consistency of multiple witnesses testifying that Towns performed VOEs as part of the scheme, as well as the corroborating physical evidence described in Section I(A) and other documents and phone records. For example, Lorenzen's testimony that Towns discussed false VOEs with her was corroborated by Towns's phone records, which showed 26 phone calls between her cell phone and that of Lorenzen. Barss's testimony was similarly corroborated by phone calls

in Towns' phone records. Harris's testimony that Towns went by the alias of "Smith" for verifications because her boyfriend, Brown, used that name, was also corroborated by the name "Trey Smith" on several documents.

Finally, the jury was given a caution and great care instruction regarding the testimony of cooperating witnesses, following the Seventh Circuit's Pattern Jury Instruction 3.13. With respect to Co-Defendant Green, the jury was instructed:

> You have heard testimony from Tracy Green, who:
> –received benefits from the government in connection with this case, namely an agreement by the government that, in exchange for her truthful testimony and cooperation, the government would recommend to the court that she receive a reduced sentence; and
> –has pleaded guilty to offenses arising out of the same occurrence for which the defendant is now on trial. Her guilty plea is not to be considered as evidence against the defendant. You may give her testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.

(R. 221, p. 15). With respect to the other cooperating Co-Defendants, the jury was instructed:

> You have heard testimony from Carolyn Thompson, Brian Barss, Jennifer Lorenzen, Kenneth Smith, Donald Felton, Steven Anderson, Wayne Harris, and Barry Adams, who:
> –hope to receive benefits from the government in connection with this case, namely that, in exchange for her truthful testimony and cooperation, the government would make his or her cooperation known to the court so that he or she might receive a reduced sentence; and
> –have pleaded guilty to offenses arising out of the same occurrence for which the defendant is now on trial. The individuals' guilty pleas are not to be considered as evidence against the defendant. You may give his or her testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.

(R. 221, p. 16.) Again, "absent a showing to the contrary, [there is a presumption] that the jury limited its consideration of testimony in accordance with the trial court's instruction." *Bermea-Boone*, 563 F.3d at 625. Thus, the Court presumes that the jury took the cooperation of the Co-

Defendants into account in assessing their credibility and accorded their testimony the weight it was due.

Given the analysis in Section I(A) supra showing that the Government provided substantial, corroborated evidence demonstrating the disputed element of intent to defraud, *see Radziszewski*, 474 F.3d at 484-85, the verdict was not "so contrary to the weight of the evidence that a new trial is required in the interest of justice," *see Washington*, 184 F.3d 657. Thus, Towns's Motion for a New Trial is denied.

## CONCLUSION AND ORDER

For the reasons stated, the Court denies Towns's Motion for a New Trial and her Motion for Judgment of Acquittal.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: July 28, 2010